No. 34,528

THE ORTMEYER LUMBER COMPANY, *Appellant*, v. THE CENTRAL SURETY AND INSURANCE CORPORATION, and C. F. CARPENTER, *Appellees*.

(98 P. 2d 97)

Opinion filed January 27, 1940.

*Walter F. Jones, Claude E. Chalfant, Charles S. Fulton* and *J. Richards Hunter,* all of Hutchinson, for the appellant.

*J. S. Simmons, Alva L. Fenn* and *Ted H. Hurtt,* all of Hutchinson, for the appellees.

The opinion of the court was delivered by

ALLEN, J.: This was an action by a lumber company to recover from a contractor and the surety on his bond for materials furnished in the construction of a schoolhouse. Plaintiff sued for the balance due on the contract, $1,777.50, plus interest and costs. The court rendered judgment against the contractor, Carpenter, for $1,833.80 and against the surety company for $633.80—the total recovery against both defendants not to exceed $1,833.80. From this judgment plaintiff appealed and the defendants have filed a cross-appeal.

On June 14, 1937, the defendant, Carpenter, entered into a contract for the construction of a school building at a stipulated contract price of $18,135. The contractor, with the defendant surety company as surety, executed a bond to the state of Kansas for the

benefit of the persons entitled thereto in the sum of $18,135, the condition of the obligation being that if the contractor should well and truly pay all indebtedness incurred for supplies, materials, or labor furnished or consumed in connection with the construction of the public building in question, then the obligation was to be null and void, otherwise in full force and effect.

In the answer of the defendant, Carpenter, it was alleged that under the agreement between the plaintiff and Carpenter the plaintiff was to assist Carpenter to secure the job by making up the bid for the contract, and would back him with money to carry on the job and protect him against loss, that defendant was to buy all lumber and material from plaintiff, that plaintiff was to have the profits from the lumber, and the defendant Carpenter was to have the profits from the labor and work and the usual contractor's profits.

The defendant surety company in its answer stated:

"Further answering herein this defendant adopts and makes a part of its answer herein the answer of its codefendant, C. F. Carpenter, as fully as though said allegations were set out in this answer and alleges that by reason of facts therein set out this plaintiff was a partner or joint adventurer of the said Carpenter and under the facts therein states this defendant is not liable to the said plaintiff.

"Plaintiff further says that on the letting of said contract to the said Carpenter a surety bond was required of the said defendant Carpenter and he applied to the agents of this defendant, the Long-Sherman Agency in the city of Hutchinson to furnish such bond. That the said agent informed said Carpenter that his financial statement did not show sufficient assets to enable the defendant, Carpenter, to carry on said work and take care of any loss or shortage which might be on said job, and that on such showing it would be impossible to write the bond in the amount required, and thereupon the said Carpenter informed said agent that the plaintiff herein was interested in said contract and would stand back of him to enable him to carry out and complete said contract. That the said agent of this defendant went with the said Carpenter to the office of the said plaintiff and informed the general manager thereof, J. L. Powell, that the defendant could not write the bond as the said Carpenter did not have sufficient assets to carry on said contract and protect against any possible loss therein and thereupon the said J. L. Powell informed the said agent that they were backing Carpenter and would see him through. That they were willing to place to his credit a sufficient sum to enable him to carry on with said contract and to protect him against any loss on the bond that Carpenter was required to give, and after some discussion it was agreed that the sum of $1,200 would be a sufficient amount. That the said agent required that some written statement be made so that he would know that the bank would advance said amount on demand, and the said plaintiff executed and delivered to this defendant for use to the Central State Bank

a written statement, a copy of which is hereto attached, marked "exhibit A," and made a part hereof. That it was agreed and understood that said credit was to be available to the said Carpenter during all of said time to pay said bills and protect this defendant against any loss on said bond.

"That thereupon and on the strength of the said agreement to stand back of the said Carpenter and the furnishing of said amount of credit to the said Carpenter, this defendant executed said bond.

"Defendant further alleges that the said bank did furnish certain credit to the said Carpenter on notes signed by the said Carpenter and said plaintiff and that the said Carpenter by the direction of said plaintiff used the money paid to him by said school district to pay said notes instead of paying debts that might become a liability on said bond."

It was alleged that by reason of the premises that as between the defendant surety company and the plaintiff, the plaintiff is primarily liable for any unpaid debt incurred by Carpenter in the performance of his contract.

The plaintiff lumber company owned five yards, the main office being at Wichita. Powell was the manager of the Hutchinson yard. A school district in Reno county advertised for bids for a new schoolhouse. The defendant Carpenter entered into a verbal agreement with Powell to buy the lumber and other building materials from the plaintiff company, if Powell would assist Carpenter in getting the contract. Employees of the lumber company assisted him in figuring the estimates upon which his bid was based, secured a check of $1,000 to accompany the bid, and Carpenter, being the low bidder at the letting, was awarded the contract. Before the contract could be entered into it was necessary that Carpenter furnish faithful performance and statutory lien bonds for its completion. The plaintiff had arranged a credit of $500 at the bank for Carpenter. The circumstances under which the bond was executed by the surety company is shown by the following excerpts from the testimony.

Long, local agent for the defendant surety company, testified:

"A. Down at Mr. Powell's office, I told Mr. Powell that $500 wouldn't be enough to bond this job, and he said, 'What do we need to get a bond written on it?' I said, 'You will need at least $1,200.

. . . . . . . . . . .

"I told Powell $500 cash in the bank would not be enough to write a bond on Carpenter for this job.

"Q. Did Mr. Powell make any statement to you about backing Mr. Carpenter or he was going to see him through or anything of the kind, in your presence? A. No, sir.

"Q. What did you tell him? A. I told him it would be necessary to file

a line of credit giving the firm of the Carpenter Construction Company the necessary working capital to enable them to get their operations started."

Powell, local agent for plaintiff, testified:

"Long said at that time that he did not think that the bond could be written with just $500 shown as working capital; that he did not believe that the bonding company would feel that this big an operation could be commenced, started and then go along with that amount of capital, and that that would be an insufficient amount—and Long said that he thought if it could be arranged whereby Carpenter could have $1,200, that he felt sure the bonding company would go ahead and bond him for the job.

"I asked Long if it had to be in cash. Long said no, not necessarily. That 'if you could give a letter to my company so that they could have some assurance that Mr. Carpenter would have that much money to start his operations on that would be sufficient.'"

Long, agent for the surety company, dictated the following letter which was typed and signed by Powell as manager of the lumber company:

"Central Surety & Insurance Corporation
Kansas City, Missouri.

DEAR SIRS—We, the undersigned, in connection with the building of School District N. 23 Reno county, Kansas, as per plans and specifications prepared by Smith and English, hereby agree to extend to C. F. Carpenter, contractor, our name for the purpose of procuring a line of credit with the Central State Bank, Hutchinson, Kan., to the extent of $1,200.

Very truly,     THE ORTMEYER LUMBER CO.,
By J. L. POWELL, *Manager*."

Thereupon the bond sued on in this section was executed by the defendant surety company.

On September 17, 1938, the trial court filed a written opinion in the case, and judgment was entered. Thereafter the judgment was set aside, further testimony was taken, and on April 22, 1939, a second written opinion was filed. We quote from the last opinion:

"After Carpenter was awarded the contract for the erection of the schoolhouse and from time to time as the necessity arose, Powell endorsed notes for Carpenter at the Central State Bank, at one time the total amounting to $1,200. All these notes were signed by Carpenter, The Ortmeyer Lumber, by J. G. Powell, manager, and by J. G. Powell as an individual, co-makers, and all have been paid by the defendant Carpenter.

"The Ortmeyer Lumber Company, through its Hutchinson yard sold building materials to Carpenter for the erection of the schoolhouse, and there is now due and owing Ortmeyer Lumber Company from Carpenter the sum of $1,833.80. The Ortmeyer Lumber Company has brought this action to collect on the bond this balance with interest at six percent from November 19, 1937. Judgment has heretofore been rendered against Carpenter for that amount on September 17, 1938.

"The defendant bonding company contends that the Ortmeyer Lumber Company and Carpenter, the contractor, were engaged in a joint venture, rendering each liable for the debts thereof. The evidence does not support such a conclusion in view of the Kansas decisions on the subject. The plaintiff assisted in securing the contract and sold lumber for carrying it out, beyond that it had no interest in either the profits or losses nor no control whatever over the subject matter of the alleged venture, the erection of the schoolhouse. The plaintiff's interest was solely in the profits it would receive from the sale of its materials.

. . . . . . . . . . . . . . . .

"The evidence in the case on trial does not warrant a conclusion that borrowing money, or otherwise pledging the credit of the plaintiff was usually incident to the management of one of the plaintiff's local yards, and there is not the slightest evidence that defendant had any reason to believe that it was.

"However, another question still remains to be answered: Can the plaintiff now take advantage of the unauthorized act of its agent? Does not the maintenance of this action, after the discovery of the agent's act in writing the letter, amount to a ratification.

. . . . . . . . . . . . . . . .

"In the case on trial, Powell made a contract with the surety company for the benefit of his principal, the plaintiff, to furnish $1,200 credit to a third person, in order that the third person might be able to buy lumber and building materials from the plaintiff, and relying on that promise the defendant surety company executed the bond. Now, plaintiff cannot maintain this action without ratifying the unauthorized act of its agent, and when the act is ratified, the plaintiff owes the surety company $1,200, which amount deducted from the balance due the plaintiff from the contractor, whose bills the surety has agreed to pay, leaves a balance due the plaintiff of $633.80, for which amount with interest at six percent from November 19, 1937, judgment will be rendered at the next motion day, April 22, 1939."

Defendants contend that the plaintiff lumber company and the contractor were engaged in a joint venture, that the defendant Carpenter has suffered the loss of his labor, and as the plaintiff has had its profit for the sale of its lumber, it should suffer the remainder of the loss. As shown above, the trial court found the evidence did not support the theory that the plaintiff and the contractor were engaged in a joint venture. We think this conclusion was justified by the record.

Defendants also contend that there was an agreement between Powell, local manager of the plaintiff, and the defendant surety company, whereby plaintiff guaranteed to protect the defendant surety company to the extent of $1,200, against any loss on the faithful performance bond executed by the surety company. Did the plaintiff lumber company agree to save the surety company

harmless from its liability on the surety contract to the extent of $1,200?

The letter of the plaintiff lumber company, dated June 15, 1937, addressed to the surety company, recites that the lumber company agreed to extend to the contractor, Carpenter, "our name for the purpose of procuring a line of credit" with the Central State Bank to the extent of $1,200. What was the meaning of the words "a line of credit" as used in this letter? As we have seen, the letter was dictated by Long, agent of the surety company, and typed by Powell, agent of the plaintiff lumber company. Long testified that he told Powell in order to secure the bond for Carpenter, "it would be necessary to file a line of credit giving the firm of the Carpenter Construction Company the necessary working capital to enable them to get their operations started." Parker, agent for the lumber company, testified that the surety company required some assurance that Carpenter would have $1,200 "to start operations on." It thus appears that the persons who formulated the letter understood the words "a line of credit" as used therein to mean the plaintiff was to assist the contractor in getting a working capital to start operations on the contract. Thus we fail to find anything in the letter or in the testimony of the parties concerned that could be construed to be an agreement on the part of the plaintiff to indemnify the surety company against ultimate loss on the surety bond.

It is to be remembered that the defendant is not a gratuitous, but a compensated surety. It is engaged in the business of executing surety contracts for a stipulated premium. The corporate surety's contract is usually drafted by its attorneys after an investigation of the risk and upon payment of the appropriate premium. We have held that such compensated or corporate surety will not receive the benefit of *strictissimi juris* in the interpretation of its contracts. (*Hull v. Bonding Co.*, 86 Kan. 342, 120 Pac. 544; *Lumber Co. v. Douglas*, 89 Kan. 308, 131 Pac. 563; *State v. Construction Co.*, 91 Kan. 74, 136 Pac. 905.)

In the situation here presented the agent of the surety company had examined the risk. He knew the contractor's financial rating. He dictated the letter signed by the lumber company. Thereafter it executed the bond sued upon. It had the opportunity to limit the amount of its liability. It would have been an easy matter to have provided in the bond the extent of its obligation as now contended for on this appeal. With full knowledge of the facts it accepted the

premium and assumed the obligation specified in the bond. The record discloses no valid reason why such obligation should not be enforced.

The trial court found that the plaintiff could not maintain this action without ratifying the unauthorized act of its agent, Powell. We are unable to agree that the case turns on the question of ratification. The question whether Powell, the agent of the plaintiff, had authority to extend a line of credit to the contractor, and the question of ratification of the unauthorized act on his part, seems to be predicated on the assumption that the agreement on the part of the plaintiff was to indemnify the surety company against ultimate loss on the bond. The argument thus assumes the main point at issue. We have found that the agreement was to establish a line of credit to assist the contractor in getting a working capital to start operations on the contract.

The judgment against the defendant Carpenter for $1,833.80 is affirmed. The judgment against the defendant surety company for $633.80 is remanded with directions to enter judgment against the surety company for $1,833.80, the judgment to recite that the total recovery against both defendants shall not exceed $1,833.80 with interest. The judgment against the surety company as thus modified is affirmed.

THIELE, J. (dissenting) : I dissent. The record discloses that had it not been for the letter of the lumber company that it would extend its name to the contractor so that he might obtain a line of credit at the bank, the surety company would not have signed the bond. The ordinary meaning of the phrase "line of credit" means a margin of credit extended. (See *Shneider-Davis Co. v. Hart*, 23 Tex. Civ. App. 529, 57 S. W. 903, 904, and *American Button-Hole, etc., Machine Co. v. Gurnee*, imp. 44 Wis. 49, 62; 37 C. J. 1261.) The effect of the letter was to assure the bonding company the lumber company would stand behind the contractor to the extent of $1,200. The loan was procured as agreed. Out of the proceeds of the building contract that particular debt was paid. Had it not been so paid, the lumber company would have been liable to the bank. Had it been compelled to pay the bank, I hardly believe the lumber company could recoup from the surety company. But by indirection that result is now to be accomplished.

Stated in another way, the lumber company told the surety company it would back the contractor to the extent of $1,200 if the

surety company would sign the bond, having procured the bond to be issued for its own benefit in the prospective, and later realized, sale of lumber, it should not be allowed to deny its original position. The disposition made of this appeal permits the lumber company to profit by its action in inducing the surety company to execute the bond.

In my opinion the judgment of the trial court was correct and should be affirmed.